Good morning, Your Honor. I'd like to reserve three minutes for rebuttal. We'll try to help you, but keep your eye on the clock. You know it goes down, so... Does that work? No, I don't mean the microphones. The clock goes down. Oh, understood, Your Honor. May it please the Court, my name is Clinton Woods, and I'm here on behalf of plaintiffs and appellants Robert and Danelle Blangeres. This is, in my view, a unique case. It's different than any case that I've ever litigated before, and it's different than any case that any of the other plaintiffs' lawyers have litigated before, in the sense that you have three companies. You have a manufacturer, a seller, and a warranty company, and you have sort of a three-card monte, a shell game between these three companies that has created consumer fraud on the front end of the transaction and on the back end of the transaction. The consumer fraud takes the form on the front end in at least four different ways. You have the warranty being created not by the warranty company and not by the manufacturer, but by the seller. The warranty was created by the seller by just copying the warranty of one of the... What difference does it make? Well, it makes a difference because there was no effort on the part of any one of these three companies to determine whether or not the warranty representations that were being made were accurate, were truthful. How do you know that? Because the record indicates that no testing was done on the steel coating, the steel siding that was actually sold, as the U.S. seems. So do I understand your position to be that the seller could not ask for the signing of the card in connection with the limited warranty unless the seller itself had conducted certain tests to prove everything conceivable, I suppose, about this siding, right? Well, the seller could, but that doesn't mean that the marketing and warranty representations going forward are therefore acceptable. The first question is whether the warranties are actually effective. In other words, the express warranty required that they mail the card. They did not mail the card. So we toss that out. Why shouldn't we? I would disagree, and that was the decision that was made by the district court. And the reason why is we have, I believe, at bare minimum, a material issue of disputed fact as to whether or not the defendants waived that requirement, the warranty registration requirement. This is based on the way it treated other people? Correct. And what case law do you have that suggests that that would result in a waiver? Well, the case law with regard to implied waiver does not require actions on behalf of the… But this is express waiver first. We're talking about the express waiver. We're talking about the express warranty. Correct, Your Honor. Yeah, the express warranty. And so the implied waiver, the case law is very clear that when determining implied waiver, the analysis has, you start on the, you use the behavior of, well, the defendant and the respondents in this case. It has nothing to do with the behavior of the plaintiffs. Before you get there, I just want to be sure you answer my colleague's question. Do you acknowledge that you have no express warranty because the card was not returned? No. Express warranty. I understand. Yeah. No, we do not. And that's because you think there's an implied warranty? No, because there's an implied waiver of the warranty. Oh, an implied waiver because other people didn't have to return the card and they got services. Correct. All of the cases that have been cited, both below and by the defendants, are analyzing waiver on an estoppel theory where you have conduct between the two parties. Well, were your clients aware that the seller was treating other purchasers differently? No, Your Honor. They were not. But the case law, I think, is clear that that's not actually relevant. Now, didn't the other purchasers also have some other documents that identify that they had actually purchased this product from the seller? In some cases, they did. In some cases, they did not. I believe that the testimony is that there was at least 100 different or approximately 100 different warranty claims that were made on this company. So the rule that you apply is that even if there is a failure to comply with the warranty, if the issuer of the warranty treats, I don't know, one or more of the other purchasers differently, that effectively then voids the warranty. Again, it's not just one or more. We're talking about approximately 100. But it's a course of conduct on the part of the defendants wherein, if you credit the declarations that they've submitted from the CEO of KVP that they never invalidated warranties on a technicality, it's possible that the Belangerises are the only consumers that this warranty requirement has ever been enforced against. Let's help you out here. Let's assume for a moment that you're right. Aren't you still stuck with the statute of limitations problem that would basically do away with any relief from the implied warranty? Okay. And the implied warranty is different. And it's important to note that the court below did not determine that the express warranty. In other words, you're saying that maybe I misunderstood you. I thought you were saying that because other people weren't required to return this, that even though you didn't return the card, you may not have an express warranty, but you have an implied warranty. You're saying that you actually have an express warranty even though the card was not returned, and you rely for that on the fact that some people got relief without returning the card. Is that right? That is correct on an implied waiver theory, not an implied warranty theory. I apologize if I misspoke. But it's an implied waiver theory on the express warranty. What is an implied waiver? An implied waiver, and we briefed this in our brief, an implied waiver arises where a party has pursued such a course of conduct as to evidence an intention to waive a right where the party's conduct, in this case the defendant, is inconsistent with any other intention than to waive it, and that's the Bowman case. With respect to the proposed warranty person, for example, it doesn't have to be conduct vis-a-vis your client, not just anybody? No. No, the case law on implied warranty is the conduct of the defendant. Even just if we take that as true, it seems like the defendants had an inconsistent policy on how they treated individuals with regard to requiring the warranty registration. But when we look to Bowman, it appears that their conduct was not inconsistent with any other intention than to waive the requirement of the registration card. Defendants sometimes accepted alternative forms of proof that the product was theirs, but nothing about those exceptions, it seems, evinced a desire to not enforce the warranty registration. Instead, it seems to have shown an alternative way for defendants enforcing the underlying purpose of the warranty registration. Isn't that what Bowman tells us, that, you know, that's okay? Well, the underlying purpose of the warranty registration is simply to identify, and that's what the testimony of the defendants were. So it was simply to identify whether the transaction was their steal versus somebody else's. This is a fungible product. They could have bought this anywhere, and the purpose of the warranty of the registration is to make sure the record indicates they bought it from this seller. Otherwise, anybody could just bring in the product and make that claim. And that's correct. And, you know, the record is clear that, you know, they never asked the Blangeras, hey, give me your sales contract, let me come out and look, nothing like that. They just denied the warranty claim. But even if this is the one case in which the warranty claim or the warranty registration requirement was enforced, and we don't know whether it is or it's not, then that, I think, goes directly to the CPA claim. The Washington CPA claim, which is a much broader Consumer Protection Act than most states, most Consumer Protection Acts that I've ever seen. But with respect, counsel, doesn't that act, though, in effect, isn't it kind of an umbrella over an underlying claim? It's actually broader. I mean, yes, yes and no. It's similar to, I'm from California. I am too. I get that. But in California, we look to an underlying violation somewhere, and then this is on top of it. Is that different in Washington? It is. Can you name me any case where relief has been granted in Washington where there was not an underlying violation of something, some other statute, some other case law? The standard is unfair or deceptive, and it's just capacity to deceive. So there are cases that the record is replete with cases where you don't have to prove consumer reliance, unlike the California statute. You don't have to prove. I get that. What I'm saying is at bottom, though, you're talking about the methodology. You prove it. But what I'm saying is don't you have to show that there was a violation of some other law in order to prove this? No, just that it's unfair, and that is a determination that can be made by the founder of fact or that it has the capacity to deceive. But don't they have the defendant has to be aware of the violation? No. As a matter of fact, and I can find a case on that, the intent of whether or not they intend to deceive is actually irrelevant. And the case is University of Washington v. Government Employment Insurance, and that's at 404 P3rd 559. Let me focus on this case. At the time of the purchase, had anybody ever complained to the defendant that there was a defect with this product? Yes, they had. First of all, there was a 1993 letter. Well, that came after. That wasn't before the purchase. That was before the purchase. A different part of the product too, a different aspect. I understand the purchase was in March of 1999, and the complaint was filed in December of 1999. First of all, that's if you credit the defendant's records, which they acknowledge is incomplete. But, yes, Your Honor, the first warranty claim was made in December of 1999. That's not the first complaint. There is evidence in the record that there's a letter in 1993. But that's another product, isn't it? No, it's not. But where's the ER on that? The ER is 494 to 497. I'd like to ask you questions regarding that 1993 letter, I guess focusing on the fraudulent concealment part of your case. Isn't the defect described in the 1993 letter a pre-installation defect? And I guess I would like to know, is that different from the defect the Blandris' complaint of, which is a post or it seems to be a post-installation defect? I'm just trying to figure out how we can assume the defendant should have had knowledge of the defect the Blandris' complaint of when that defect was different than the defect in 1993. It's the same defect. Why is that? Because there's nothing that changes in the product once you install it that creates a different defect. Why did it take so many years for the defect to manifest itself in your client's case if it was present pre-purchase? Well, in our client's case, it only took approximately a decade. But the marketing representations are that this product would last a lifetime. But the defect in the 1993 letter pertained to the condition of the siding pre-installation. And one is pre-installation, the other one occurs 10 years later. You think it's the same defect? It's an inherent defect within the product. And our experts went and looked at the product and ran a bunch of tests that the defendants didn't do and determined that there would be a failure rate, a delamination failure rate as high as 70 percent within the product. So is the process, just to help me understand what you're saying, that that process didn't have anything to do with this, is the process that occurs before installation, you know, the rolling out of the siding something that materially changes the product such that the defect prior to all that process could not exist after that process or that the defect after installation could not have been created by the process? Sorry, I didn't mean to interrupt you. I just wanted full. There's nothing in the record to indicate that it changes the defect. In fact, if you look at our expert report, it indicates that the defect is inherent with the product. Do you want to save any of your time? I do want to save. Can I just ask one more question before? I know you're almost out of time, but still focusing on that 1993 time period, doesn't the subsequent 1993 letter from, I think it was from KBP, it can't show that KBP implemented a new quality control type of program and that any of the defects were addressed or, you know, how can we assume, and I guess I'm going to the time period, six years later in 1999, the same type of defects were occurring with the siding and that the defendants had knowledge of? I think that that's one inference that you can take from that record. That's one conclusion that somebody can draw. The point that we're trying to make is that a jury could look at that 1993 letter and reasonably infer that the defendants were on knowledge of a defect in the product that would cause consumer claims. Were there any quality complaints about the siding from 1993 to 1999? I don't know the answer to that, Your Honor. Thank you. Thank you. Okay. Okay, we'll hear now from the police. Good morning, counsel. Good morning, Your Honor. My name is Al Bauer. I'm here on behalf of U.S. Seamless. In terms of time, I'd like to save five minutes for Mr. Pollack, who's representing me. Watch the clock and we'll try to help you. I think, as Your Honors have pointed out, this is really, at its heart, a breach of warranty claim. It suffers from a fundamental defect. I'll take these off. And that fundamental defect is that there was no breach of warranty. The reason why there's no breach of warranty is because there was an invalid and enforceable warranty registration requirement, and it's undisputed that plaintiffs failed to timely submit the warranty registration card as required by the plain and unambiguous terms of our limited warranty. As you know, your opponent claims that you waived the right to claim that there was no express warranty because you treated other purchasers who failed to return the card differently. What's your response to that? Your Honor, those were wholly separate contracts with wholly separate and unrelated parties. Plaintiffs don't cite a single case where there is a situation where a defendant or a company is held to have waived a contractual requirement through conduct with an unrelated party in an unrelated contract. In fact, the case law is a little bit stronger than that. Even when it's the same party, there's the case from Oregon, I believe, the Robinson case. We got our contract. You waived this non-compete provision. Okay, we renew the contract, same exact parties. Oh, hey, we think you waived the non-compete because you waived it the first time, and the court said, no, this is a separate contract. You're not going to do that. The other case is the Chesner case, which is pretty much directly on point. So basically the case law just kills that one dead because they don't meet the requirement of having the same party as somebody else. That's what I believe, Your Honor. Correct. I'd like to talk to you about this 1993 letter that we were talking about at the end. I guess what's your response in general? But isn't the 1993 letter evidence that there were customer complaints about the citing defects prior to 1999? It seems like that might be significant, and were there any quality complaints I'd like to know from your perspective from 1993 to 1999? Your Honor, two things. When that letter is using the word customer, I believe that it's referring to U.S. Seamless' franchisees. What was happening was this rolled steel coil was getting delivered to installers, who are U.S. Seamless' franchisees, and they were having problems with it before they applied or embossed. Are we talking about ER-494? I don't have the number in front of me, but yes, Your Honor, I know that letter. Because it seems like the Seamless' president specifically notes that there have been customer complaints, so many that it is difficult to absorb. You're saying that's franchises and not customers? Yes. Based on what? Our franchisees are our customers. That's who we sell this stuff to, and that's who are making these complaints. These weren't complaints about installation of seamless steel siding on residential homes. They're complaints from our franchisees saying, you gave me bad coil. The paint's not adhering. And I want to just take one second to clear up a bit of confusion in terms of this process. But even if they were franchisees, I'm just trying to figure out, isn't that still defects in the process? I mean, they're complaining about defects in the product. They're complaining about problems with the product, correct, not the same product that the plaintiff had, and also not the, in my view, not the same. What do you mean by not the same product? Why isn't, I guess, why isn't that evidence of an inherent defect?  It is evidence of a problem with some of this product. I agree with that. I'm saying it's not the same. Maybe I misspoke. I'm sorry. What did you say? It is evidence that at this time there was a problem with our process. At least on occasion there were problems with our process. Your product? Yes, or some of the product, correct. I don't dispute that. I mean, they were having some problems when these franchisees, and maybe I misspoke, but what I was trying to say is that this is not the same issue that was affecting the plaintiff's side. I understand it's not the same issue, but is it the same product? Yes, it's the same coil. And I want to just explain something about this process. What U.S. Seamless provides to our franchisees is a piece of rolled steel coil. Our franchisees then cut it to size. That's how it becomes seamless, and they also emboss it with a wood grain. So there is a difference in the process other than it just arriving unembossed. So there is a little difference between what gets installed and what gets delivered to the installers. But if it is the same product, even though it's before and so on, isn't your opposing counsel correct that since this was a summary judgment, there may be issues that a jury ought to decide on the degree to which your client knew that there was an inherent defect, if any, in this product? I don't think that there's an inherent defect in the product. No, you don't. But I'm just saying, isn't this something that a jury ought to decide rather than the judge on summary judgment? Well, first of all, there were corrections to the process made during this. I understand that. And the other part of that is there's a six- or seven-year gap where we're installing this stuff. But I've been asking this, and I feel like I haven't gotten an answer. Were there any quality complaints about the siting from 1993 to 1999, formal or informal? I'm not aware of any, Your Honor. What I can state with certainty is that there were no customer warranty claims during that time period. And I'm unaware of any formal complaints either. That's the best I can do. I'm not aware of, and I don't believe there's evidence of, informal complaints in the record. And the first warranty claim, I believe, was in December of 1999. So in that interim period, there were no warranty claims, and I'm not aware of any informal complaints. All right. So just a further follow-up question in this area. In your briefs, and I think somewhat today, you're making a point of explaining that the defects in the 1993 letter might be different than the defects that the Blanders complain of, although right now you just said, you know, that coil, it seems like there was an inherent defect. The baseline of the defects was that the paint was chipping and peeling. Is that correct? Yes, Your Honor. Okay. How is it material, then, that the chipping occurred pre- or post-installation? In either case, it seems like the paint was chipping and peeling from the siding, despite the fact that it was supposed to be durable and last a lifetime. I believe it's an immediacy problem. The paint wasn't sticking well at all the first time, and there were quality-controlled issues that were resolved to our satisfaction. The second defect is one that occurs. This isn't happening when you open it up. The first defect manifests when you open the box. When our installers are, for a better description, is when they unroll the steel coil. The defects that the plaintiff is complaining about is something that happens 12 years later. Those are qualitatively different. Well, I'm not sure. It's the same product. You've conceded that. As my colleagues pointed out, we're talking about paint peeling. But the reality is you said that the problems that you admit occurred were resolved to your satisfaction. Doesn't the plaintiff appellant have an opportunity to present what he and his colleagues come up with in discovery to show that perhaps there was something else going on or that there was some knowledge that there were more problems with the product than you currently concede? Bottom line, isn't this something that a jury ought to decide? I don't believe so, Your Honor. If you look at sales, I mean, that's adopting a very, very broad disclosure requirement for any company that sells a product. Do you have to reach back into your files five years, 10 years, 15 years, 20 years? It depends on the product. It depends what you've heard, and that's the problem here. If your records show that the problem that was involved in 1993 was entirely different and was resolved based upon your own people and experts and so on, then you're fine. The jury is going to find you that you're just fine. On the other hand, if what you found was you think maybe you've solved it, but you're not sure, let's see what happens. And then later on, there's a problem. Then you have that prior knowledge, or at least we're put on notice. Do you agree with that? I believe that we had notice of a qualitatively different problem. Okay, I get your point. Now, you're past your five minutes. I don't know whether you want to go on or you want to have your colleague come up. Yes. Okay. Any of my colleagues have more questions? Okay. Good morning, Your Honor. Good morning. Patrick Pollack representing the KBP. Let me speak up just a little bit, counsel, and maybe raise it a little bit there so we can hear you well. You know where the button is, Your Honor? Yeah. Ah. And you're, of course, being videoed, so we want to be sure that you're preserved for posterity. Thank you, Your Honor. I represent KBP Coil Coaters and KCAN Limited, and I will be brief on what I intended to address, but I want to touch on a couple of the points you raised. First of all, Your Honor asked about the distinction between installers and customers. All of that is discussed, including how the 1993 letter was resolved in Mr. Bullinger's declaration, which is at SER 710, the supplemental record. And what is clear is that this was part of the startup of the product, of the product program, and that once the problem was identified, quality controls were put in place. There was then a six-year period, and I will say unequivocally that the record shows that there were no customer complaints during that six-year period. The first customer complaint was about eight or nine months after the product was installed on the Bullingerises. So the only omission that would be relevant, there couldn't be a disclosure of things that had never happened, i.e., customer complaints. When the 1999 complaint came in, what bearing, if at all, did it have on the earlier defect that you believe had been corrected? Absolutely none. Well, it was the same product. Well, it was the same product, Your Honor, but I guess what I would segue to is the fact that I'd underscore that a repair or replacement warranty, a promise to repair and replace, which is what we have in this case, is not a guarantee that the product is going to never have any problems. So in this particular instance, the warranty was issued, and I think the case law demonstrates that when a product is issued, it's contemplated that there might be a problem. Are you saying that, let's just say hypothetically, that these people had returned their card, are you saying that they would have had no relief here because what happened with the paint, just the way it goes, and that's not a normal wear and tear? No, no, no, no, not at all, Your Honor. Okay. If someone had returned their card and there were 8,000 cards returned, their house would have been repaired or replaced. In this particular instance, my client takes great pride not only in its product, but in its warranty program. In its warranty program, there were 801 claims as of October 2015, which is two months before Judge Bastian heard this case. Of those, 95% of those were repaired and replaced at my client's expense. And were they of exactly the same nature of the paint peeling claims? I can't say that I know what all 759 is. There were a substantial number of them of the same nature. They had characteristics of cracking and peeling. And they're dealt with the paint, right?  With the paint? Yes, Your Honor. Okay. Yes, Your Honor. And that's what the warranty covered. So my client dutifully went out and repaired or replaced those. There were only 5% of those 801 claims that were not addressed, either because the homeowner didn't respond, presumably they sold the house or they didn't consider it serious enough, or because they hadn't registered their cards. Bottom line, at least it seems to me, here you have a product where if you have 801 claims made, that's a lot of claims. I don't know what the total number of installations were, but that's a significant number of claims. You've indicated that at least a number of them were of the same nature. So you've got some kind of a problem. Whether it was noticed before is another matter, but you certainly have a problem with the product to some degree, right? Well, I would argue, Your Honor, that none of this is on the record because our experts weren't allowed. We never got to that point. But the bottom line is 10% product failure in this type of instance isn't a lot. Is that what this was, 10% failure? Well, actually, it was, yeah, there's 801 warranty claims out of 8,000 return cards, so approximately. But the bottom line is that was the whole point of the limited warranty, is if there's a problem, we fix it, and we did. And the one thing that is overlooked is that we had a relationship with these contractors that would go out into the field, and when they did a repair or replacement, they were not paid until the customers signed off that they were satisfied. I don't agree. Taking what you say at absolute face value, would you say that the real issue here is did your people know about this in advance? If they didn't, you're cool. If you did, don't you have a problem? Well, I think that as of 1993, internally between the defendants, there was some communication about a concern about the product. That was corrected, and that is undisputed in the record. Has that been made available to the appellants in this case? I'm sorry? An internal communication? Yeah, yeah, that's the 1993 letter that was produced. That's all. That was corrected. Just like iPhones, when they are introduced, they might have a glitch here and there, they are corrected. There is then a – and parenthetically, although – Was it corrected? Because it seemed like it was an ongoing process of correction. I mean, what do you point to to say unequivocally that it was corrected? There is the letter that is from Mr. Dubrovsky. Can you give me an ER on that? Yes, Your Honor. If you can, please. I believe it's 387 ER. It's the June response by Mr. Dubrovsky to Mr. Bullinger where he says we have implemented QC program, and it's the builder risk or builder – the A builder supply quality control problem. From that point on, there was no problem.  And when problems arose, eight or nine months after the installation by Mr. Hadley of the – Why is it important to have the registration returned? What's the purpose of that? Well, first of all, Your Honor, I don't think it is – I think a manufacturer can require that without necessarily having a justification. Having said that, in this particular instance, there was a very good reason for it, and that is because this product effectively is somewhat generic. There were other manufacturers manufacturing the same steel – painted steel coil, and none of them had markings on them. And in fact, over the course of the – from 1991 to at least as of my last contact before the summer judgment was granted, my client had been presented with claims that there was absolutely no reason to believe that that was their product. So if there wasn't a warranty card, it was problematic. Now, there were some individual cases that were addressed where there were coil tags. These come in big coils. There's a tag on the coil. If it could be matched up, then they would do what they could to satisfy that particular customer. Are you confident that the complaints made by the appellants in this case were – the product was manufactured by your clients and not somebody else? I am not, Your Honor. In fact, this may be somebody else's problem. Yeah, I don't know the answer to that question. The way this unfolded was a complaint was registered with U.S. Seamless. It was denied. The first my client was aware of this was when a lawsuit was filed. Any other questions by my colleague? Thank you, Counsel. Thank you, Your Honor. So you have some rebuttal time, Counsel. Thank you, Your Honor. Is this their product we're talking about? Of course, I've got to follow the tall guy. Do you have assurances that the product that you've sued about is, in fact, one manufactured by these gentlemen over there, not them personally, but their clients? Yes, yes, I do. And it's in the record that the sales contract is from U.S. Seamless. The dealer sold U.S. Seamless. Where is that in the record? I don't have the – it's in the record. I don't know for sure what the ER number is, but it is in the record. There's no dispute in my mind at all as to who – You're over time. We're going to give you a minute to go ahead. So we're going to let you go here and give us what you can here. Understood. I'll try to be very brief. Counsel for KBP mentioned that they take great pride in their warranty program. For evidence of that pride, I would direct the court to ER 223 to 228, wherein the head of that warranty program brags about kicking people off on technicalities so that they can save money in their pockets. Now, later he disclaims that, says, hey, I didn't mean it, but that's a factual determination as to whether or not the warranty process is fair or likely to deceive under the CPA that should be left to the jury. I would liken this to – So the CPA can trump the express provisions of the warranty? In other words, something that may not come within the express warranty may be intended to deceive, and that will be an independent cause of action. It would be, yes, Your Honor. And, in fact, intention, reliance, and actual deception is not required under the Washington CPA. Okay. Thank you. I think your time is up. Thanks, gentlemen, all of you, for your argument. We appreciate it. The case just argued is submitted. It did take one minute. The court's going to take a brief recess. Three-minute recess. We'll return shortly.
judges: M. Smith, Murguia, Robreno